## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

  vs.                                     Cr. No. 13-966 JCH

MATTHEW BRANNON and BRANDI CHANNON,

      Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Brandi Channon's *Motion To Suppress Statements by Defendant*. [Doc. 52] The Government filed a Response [Doc. 67], and Defendant filed a Reply [Doc. 77]. On June 11, 2014, the Court held an evidentiary hearing on the Motion.

The Court has reviewed the pleadings, the evidence presented at the hearing, and the relevant law. The Court will deny the Motion.

## PROCEDURAL BACKGROUND

Defendant Brandi Channon was indicted on four counts of wire fraud, Counts 7-10, and one count of conspiracy to commit Counts 7-10. 18 U.S.C. § 1343. Defendant Brandi filed a motion to suppress her statements made at the time of execution of the search warrant on June 28, 2011, along with any other evidence indirectly obtained.

Defendant Brandi Channon, who is not in custody, was present and represented by counsel at the June 11, 2014 evidentiary hearing. The Government presented testimony by FBI Supervisory Special Agent Michael Boady. The defense presented testimony by Defendant Brandi Channon.

**FINDINGS OF FACT**

At 7:12 a.m. on June 28, 2011, a search warrant was executed on Defendants' residence in Albuquerque.  [Transcript of 6/11/14 hearing, p. 5 (hereinafter cited as "Tr."); Doc. 114-1, p. 42]  Boady and twelve to fifteen others, including members of the evidence response team and a photographer, were present to execute the search warrant.  [Tr. 5]  Some evidence technicians were not carrying firearms and stayed away from the house until after it had been declared safe.  [Tr. 44, 47-48]  At the time of entry, eight agents were positioned by the house.  [Tr. 48]

Boady and his fellow FBI agents wore bullet-proof vests marked "FBI" and carried firearms.  [Tr. 6]  They knocked loudly and announced that they were from the FBI and were there to execute a search warrant.  [Tr. 6, 20-21]  They gave the occupants time to answer the door.  [Tr. 46]  More than one agent was yelling "search warrant."  [Tr. 23]  Eight agents positioned themselves in a "stack," with their weapons drawn and pointed at the front door, in accordance with their standard procedure.  [Tr. 7-8, 19, 48]  Between two and four agents had M4's; the others had handguns.  [Tr. 19-20]

An occupant, Defendant Brandi, opened the door.  [Tr. 6-7; 51]  As Brandi walked out the front door, a female agent pulled her and moved her more quickly away from the door.  [Tr. 22-24, 51]  Four people were in the house:  Defendant Brandi Channon, Jason Moran, Roberta Duran-Gonzales, and Patrick Vigil (Brandi's cousin).  [Tr. 7, 50-51]  All four appeared at the door at about the same time, and they left the house without incident.  [Tr. 7, 23]

Agents kept their weapons drawn and pointed at the front door for a matter of seconds, just until the occupants walked out of the house and past the agents.  [Tr. 8, 51, 53]  The four occupants were subjected to brief patdowns for weapons.  [Tr. 8-9, 53]  The patdown of Brandi was conducted by a female agent.  [Tr. 9]  Agents had not expected the additional three people to

2

be in the house, and handcuffed the two men, Moran and Vigil.  [Tr. 9, 55]  Brandi was never handcuffed.  [Tr. 55]  Once the house had been cleared—which usually takes five to ten minutes—the handcuffs were removed.  [Tr. 9-10, 26, 43-44]

Armed agents entered the house to make sure everyone was out.  [Tr. 25]  After they cleared the house, the agents took off their vests.  [Tr. 13]  They try to take off their gear as soon as they can after the house is cleared.  [Tr. 26]  Boady put away his firearm, into a holster where it was not showing.  [Tr. 41-42]  Agents turn off their flashing vehicle lights and move cars away as soon as they can, to try to assume as low a profile as possible.  [Tr. 30]  Brandi testified that after the men with rifles cleared the house, they got into their SUV and left.  [Tr. 59]

After the house had been cleared, two agents (Michael Boady and Jennifer Berry) approached Brandi, who was standing on the front lawn.  [Tr. 13]  This approach was less than ten minutes after agents first knocked at the door.  [Tr. 48]  The agents told Brandi that she was free to leave, and that she was not in custody or under arrest.  [Tr. 11, 13, 30-31, 38; Doc. 52, p. 2]  Brandi said, however, that she did not want to leave because of her cat.  [Tr. 11, 30-31]  Boady asked Brandi whether they could interview her, and she agreed.  [Tr. 13-14, 29-32]  Boady asked Brandi where they could go to interview her, away from the more public front yard; they agreed to talk in the backyard.  [Tr. 13-14, 29-30]  Brandi was never read the *Miranda* warning.  [Tr. 36, 62]

Boady and Berry went to the backyard with Brandi and sat on lawn chairs, at a normal conversational distance from Brandi—about three feet apart; they all had room to stretch out their legs.  [Tr. 14, 35-36]  Other agents were also in the backyard at the time, interviewing Brandi's friend, Roberta Duran-Gonzales.  [Tr. 14, 62]  The backyard was pretty good-sized, so

that they were able to have two interviews there at the same time without being able to overhear one another.  [Tr. 35]

During the interview Brandi was nervous but otherwise comfortable talking with Boady and Berry.  [Tr. 15]  The agents spoke in a normal conversational tone of voice and were not aggressive.  [Tr. 16, 36]  They spoke quietly enough so that they were not be heard by the others engaged in the other interview.  [Tr. 36]  The interview of Brandi lasted between thirty and forty-five minutes.  [Tr. 16, 40-41]  Brandi said that she did not want Matthew to be in trouble and she wanted to take the blame for everything.  [Tr. 16]

After the interview, Brandi went into the house.  [Tr. 17]  She was free to move around the house, but was escorted by an agent.  [Tr. 17, 36]

Agents expedited the encounters with Moran and Duran-Gonzales so that they were able to leave in time for a morning flight.  [Tr. 12]

The search was completed at about 11:00 a.m.  [Tr. 17]  After executing a search warrant, agents secure the house and do not leave it open.  [Tr. 11-12]

## DISCUSSION

Brandi alleges that all of her statements made at the time of execution of the search warrant must be suppressed, along with any other evidence indirectly obtained by means of those statements.  Brandi claims:  (I) her statements were involuntary as the result of a "coercive environment"; and (II) she was subjected to custodial interrogation without being given *Miranda* warnings.  These are two separate issues, although many facts are relevant to both.  *United States v. Cash*, 733 F.3d 1264, 1280 (10th Cir. 2013) (recognizing that even if defendant was not subjected to custodial interrogation and therefore not entitled to *Miranda* warnings, defendant's statements must also be shown to be voluntary).

4

## I. Voluntariness

Brandi claims that her statements were not voluntary because of an "inherently coercive environment":  (1) they were woken up in the early morning by loud knocking on the door; (2) multiple agents were present; (3) agents' weapons were drawn; (4) at least two people were handcuffed; (5) occupants were searched; and (6) Brandi's freedom to move around inside her home was severely restricted.

The Government has the burden of proving, by a preponderance of the evidence, that a defendant's statement was voluntary.  *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006).  The question is whether the statement was "the product of an essentially free and unconstrained choice" or whether the defendant's "will has been overborne and his capacity for self-determination critically impaired."  *Id*. (internal quotation marks omitted).  The Supreme Court held that "'coercive police activity is a necessary predicate to the finding that a confession is not "voluntary."'"  *Cash*, 733 F.3d at 1281 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).  The voluntariness determination reflects a balancing of values, with one interest "'the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws,'" and another interest "'society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice.'"  *Lopez*, 437 F.3d at 1063 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224-25 (1973)).

The defendant's personal characteristics only become relevant if the court first determines that there was coercive police activity.  *Lopez*, 437 F.3d at 1064; *see United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998).  If the court concludes that the officers' conduct was coercive, then the court proceeds to consider the defendant's personal characteristics to determine

whether she was unusually susceptible to coercion, including: (1) the defendant's age, intelligence, and education; (2) the length of detention; (3) the length and nature of questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment. *Lopez*, 437 F.3d at 1063-64.

The determination of whether a defendant's statements were voluntary is made under the totality of the circumstances. *Cash*, 733 F.3d at 1279.

**(A)  Coercive Activity by Agents**

**(1) Occupants woken by loud knocking**

As part of Defendant's claim of a "coercive environment," Defendant asserts that "people were aroused from early morning slumber by loud knocking at the door." [Doc. 77, p. 2] The search warrant shows execution at 7:12 a.m. [Doc. 114-1, p. 42] Federal Rule of Criminal Procedure 41(a)(2)(B) allows execution of search warrants between 6:00 a.m. and 10:00 p.m. without any special authorization. Interpreting the Fourth Amendment in light of what was deemed an unreasonable search and seizure when it was adopted, the Tenth Circuit recognized the common law's "strong aversion to nighttime searches" as particularly intrusive, and stated that the time of execution was "sensitively related to the reasonableness" determination. *United States v. Gibbons*, 607 F.2d 1320, 1326 (10th Cir. 1979); *see United States v. Tucker*, 313 F.3d 1259, 1265 (10th Cir. 2002) (stating that time of execution, especially if nighttime, is one element to consider regarding reasonableness). The *Gibbons* Court stated that Rule 41 "is a useful guide" in this determination, because Rule 41 "implements the essentials of the Fourth Amendment." *Gibbons*, 607 F.2d at 1326. Even if Brandi and other occupants were still asleep, the Court finds that execution of the search warrant at 7:12 a.m. was reasonable and does not support Defendant's claim of a "coercive environment."

Similarly, the assertion that agents loudly knocked on the door fails to support Defendant's claim of a "coercive environment."  Officers are required to knock and announce their presence, providing an opportunity for occupants to open the door.  *Hudson v. Michigan*, 547 U.S. 586, 589 (2006).  One of the purposes of the knock-and-announce rule is to minimize the intrusion, protecting "those elements of privacy and dignity that can be destroyed by a sudden entrance" and giving occupants an opportunity to prepare for the entry of officers.  *Id*. at 594.  "'The brief interlude between announcement and entry with a warrant may be the opportunity that an individual has to pull on clothes or get out of bed.'"  *Id*. (quoting *Richards v. Wisconsin*, 520 U.S. 385, 393 n.5 (1997)).  The knock-and-announce rule is an element of the reasonableness inquiry under the Fourth Amendment.  *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995); *see United States v. Brown*, 189 Fed. Appx. 722, 724 (10th Cir. 2006) (unpublished).  The Court finds that the agents' knocking and announcing at Defendant's house, which allowed Brandi to get up and open the door, supports the conclusion that execution of the warrant was reasonable.  Compliance with the knock-and-announce rule undercuts Defendant's claim of a "coercive environment" and supports the opposite conclusion.

**(2)  Presence of multiple agents**

Between thirteen and sixteen persons arrived for execution of the search warrant.  Some of these people were members of the evidence response team and a photographer, however; these people stayed away from the house until it had been cleared by the armed agents.  Eight agents were positioned by the house.  But Brandi testified that she saw only four to six officers when she went to her front door and looked out the window.

After Brandi and the other three occupants were out of the house, and after spending five to ten minutes clearing the house, a number of the armed agents left.  By the time Brandi was

interviewed, a significantly smaller number of agents were at the property.  Only two agents interviewed Brandi.

The Court finds that there was not an excessive number of agents present, particularly when about half of them stayed away from the house until the house had been cleared.  About eight agents were outside when Brandi walked out, and she thought the number was smaller— four to six.  In addition, a number of those agents left after the house had been cleared; they only remained long enough to assess whether there was a danger of violence and long enough to ensure the safety of all involved.  A number of the agents were there just to provide security at the beginning, and a number of others were there just to collect evidence later; the total number was not excessive and did not indicate the environment was coercive.

### (3)  Agents' weapons drawn

At the very beginning of the encounter, Boady testified, eight agents positioned themselves in a "stack," with their weapons drawn and pointed at the front door, in accordance with their standard procedure.  [Tr. 7-8, 19, 48]  Brandi testified that she saw four to six agents with their guns pointed at her when she looked out her window before opening the door.  [Tr. 53]

The Government asserts that display of weapons is part of "established protocol" and argues that "it is settled that it is reasonable for officers to use firearms and handcuffs in securing a residence to be searched."  [Doc. 67, p. 10]  The Government cites *Bennett*, which states: "Police may use firearms and handcuffs as part of a permissible detention <u>when they reasonably believe it is necessary for their safety and protection</u>."  *United States v. Bennett*, 329 F.3d 769, 774 (10th Cir. 2003) (emphasis added).  But *Bennett* is a case involving a tip that the suspect was dealing drugs and carrying a firearm.  *Id*.  In contrast, the search warrant in Defendant's case was for a nonviolent offense and the Government does not argue there was a suspicion that there

would be firearms in the house or that agents had reason to believe the occupants would respond violently; Defendants had no criminal histories. *Bennett* does not establish categorical authority to point weapons in execution of every search warrant, and the Government did not attempt to demonstrate that agents reasonably believed this action was necessary for their safety and protection under the particular circumstances of this case. *See id.*

Agents executing a search warrant have "the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981). "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Summers*, 452 U.S. at 705). The Tenth Circuit held that "the authority to detain relates to all persons present on the premises," not just those who reside at the premises. *United States v. Sanchez*, 555 F.3d 910, 918 (10th Cir. 2009). The detention of an occupant—a seizure that is less intrusive than arrest—is justified by consideration of the law enforcement interests in: (1) preventing flight if incriminating evidence is found; (2) minimizing the risk of harm to the officers, and (3) facilitating orderly completion of the search when occupants are present, who may agree to open locked doors or containers. *Summers*, 452 U.S. at 702-03. The "character of the additional intrusion caused by detention is slight and [ ] the justifications for detention are substantial." *Muehler v. Mena*, 544 U.S. 93, 98 (2005).

"Inherent in *Summers*' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Mena*, 544 U.S. at 98-99; *see Graham v. Connor*, 490 U.S. 386, 396 (1989). "The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the

9

situation." *Summers*, 452 U.S. at 702-03.  When reasonable to protect their safety, officers may display or use weapons, or handcuff occupants.  *See, e.g.*, *Mena*, 544 U.S. at 99-100 (upholding use of handcuffs for two to three hours to effectuate Mena's detention; search warrant was for deadly weapons and evidence of gang membership); *Sanchez*, 555 F.3d at 918-19 (upholding detention of occupant who fled scene and was caught, ordered to "get down," handcuffed, and searched; search warrant was for illegal drugs and firearms, among other items); *United States v. Stout*, 439 Fed. Appx. 738, 747 (10th Cir. 2011) (unpublished) (holding officers had authority to detain suspect, including:  pointing guns at him as he voluntarily exited house, making him kneel on ground, and handcuffing him; search warrant was for guns, ammunition, items for manufacturing pipe bombs, among other items).  It may be reasonable for officers to take control of a situation by displaying their weapons.  *See Summers*, 452 U.S. at 702-03.  The Supreme Court stated that the governmental interests in using handcuffs to minimize the risk of harm to officers "are at their maximum when, as here, a warrant authorizes a search for weapons and a wanted gang member resides on the premises," characterizing this as an "inherently dangerous situation[]."  *Mena*, 544 U.S. at 100.  The *Mena* Court further observed that "the need to detain multiple occupants made the use of handcuffs all the more reasonable."  *Id.*

The Tenth Circuit has distinguished between briefly displaying weapons and pointing weapons directly at persons.   The Tenth Circuit held that it was reasonable for officers to have weapons "displayed and ready for immediate use" when attempting to arrest for assault a potentially armed suspect.  *Reeves v. Churchich*, 484 F.3d 1244, 1260 (10th Cir. 2007).  Officers also pointed their weapons at the occupants, but this was "brief and limited in duration to determining the Reeves' threat level," and officers stopped pointing weapons at the occupants once "the perceived threat was extinguished."  *Id.* at 1260-61.  These actions were reasonable

although directed at occupants whom the officers knew were not the suspect they sought, because officers did not know what relationship these occupants might have to that suspect. *Id.* at 1260; *see Thompson v. City of Lawrence*, 58 F.3d 1511, 1517 (10th Cir. 1995) (holding objectively reasonable officers' temporarily detaining uninvolved occupant in handcuffs while officers determined her relationship to suspect and her "possible reaction" to the situation). In contrast, the Tenth Circuit held that it was objectively unreasonable to point loaded firearms at children and to continue to do so after officers had gained control of the situation. *Holland v. Harrington*, 268 F.3d 1179, 1192-93 (10th Cir. 2001). The display of weapons, and pointing weapons directly at persons, "should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers knew at that time." *Id.* at 1192. "Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use." *Holland*, 268 F.3d at 1193.

In addition to using a reasonable level of force, it is important that the use of force be limited to the time during which officers are gaining control of the situation or assessing the risk of danger to themselves. In *Reeves*, officers acted reasonably by briefly pointing their weapons at occupants while determining whether there was any threat to their safety. *Reeves*, 484 F.3d at 1260-61. In *Holland*, officers acted unreasonably by pointing weapons at children, and continuing to hold children "directly at gunpoint" after officers had the situation under control. *Holland*, 268 F.3d at 1193.

In this case, eight agents had their weapons drawn and pointed at the front door and at occupants as they walked outside. Boady testified that they had employed their minimal level of

force for a search warrant on a residence.  [Tr. 46]  But the fact that agents followed their standard operating procedure does not, by itself, show that the force used was reasonable in this case.

Boady's testimony implies that execution of a search warrant on a residence presents a greater risk of harm than a search warrant on a business, for which they do not always draw their weapons.  [Tr. 45]  Beyond the facts that this was a residence and officers did not know who might be in the house, the Government provided no evidence that agents had any particular reason to suspect threats to their safety in this case.  Although it turned out that three additional people, whose identities were unknown to the officers, were inside the house, this fact cannot justify pointing their weapons.  The Government presented no evidence to show that agents knew there were more people inside until four occupants walked out the front door; by that time, the agents had already been pointing their weapons at the door and at anyone who walked out.

The Government presented no specific evidence that the risk of danger was higher than usual in this particular case.  *See Bennett*, 329 F.3d at 774 ("Police may use firearms and handcuffs as part of a permissible detention when they reasonably believe it is necessary for their safety and protection." (emphasis added)).  The search warrant was for a nonviolent offense, and the Government presented no evidence to suggest that a violent response was expected or that there were any firearms in the house.  Defendants had no criminal histories.  There was no evidence that any occupant refused to cooperate or tried to escape.  On the other hand, although agents used a higher level of force than the mere display of weapons, they did have their weapons out for only a matter of seconds, the time it took for the four occupants to exit the house and for the brief time it took agents to assess the situation.  This show of force might have helped the agents take control of the situation.  *See Summers*, 452 U.S. at 702-03 ("The risk of harm to

both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.").  The ultimate standard is reasonableness.  *Id.*

### (4) Use of handcuffs

Brandi was not handcuffed.  But the two male occupants, Vigil and Moran, were handcuffed for five to ten minutes, while agents cleared the house.

As with the drawing of weapons, the Government asserts that "it is settled that it is reasonable for officers to use firearms and handcuffs in securing a residence to be searched." [Doc. 67, p. 10]  The only authority cited by the Government is again *Bennett*—the case in which agents had reason to believe that the suspect might pose a danger because he was believed to be dealing drugs, carrying a firearm, and had initially disobeyed police orders to stop and instead entered his garage.  *Bennett*, 329 F.3d at 774.

The issue is whether a brief use of handcuffs—and not on Brandi herself—was reasonable or whether it contributed to a "coercive environment."  *See id.* (stating that police may use handcuffs when they reasonably believe it necessary for their safety and protection).  Agents did not expect Moran and Vigil to be in the house, and apparently did not know who they were. Although there were eight armed agents near the front door, there were three additional occupants.  *See Mena*, 544 U.S. at 100 (holding that "the need to detain multiple occupants made the use of handcuffs all the more reasonable").  Brandi was never handcuffed, and the handcuffs were removed long before Brandi's interview.  *Cf. Bennett*, 329 F.3d at 774 (stressing importance of police not restraining suspect once they determined he did not have any weapons); *United States v. Peck*, 166 F.3d 1222, *3 (10th Cir. 1999) (unpublished) (finding handcuffing not a coercive factor, when handcuffs were removed from male suspect so he was free of restraints when he made his statements; also emphasizing that female suspect had never been handcuffed).

The Court determines that brief use of handcuffs on the two unknown male occupants while agents cleared the house and assessed the situation was reasonable. *Cf. Reeves*, 484 F.3d at 1260-61 (holding brief pointing of weapons reasonable while officers determined threat level of unknown persons); *Thompson*, 58 F.3d at 1517 (holding objectively reasonable officers' temporarily handcuffing unknown occupant while officers determined her relationship to suspect and her "possible reaction" to the situation).   In addition, Brandi was not handcuffed.  The Court finds that the use of handcuffs did not produce a coercive atmosphere.

### (5) Patdowns of Defendant and other occupants

Agents performed a quick patdown of each occupant to ensure officer safety—apparently as part of their standard operating procedure.   Boady testified that the procedure generally followed in this case was "the minimum" level of force they would employ; for instance, they "always have [their] guns drawn on a residence . . . [because they] just don't know who is going to be in the house."  [Tr. 46]  If searching a business, they might not go in with guns drawn.  [Tr. 45]  Boady stated that they had no specific reason in this case to "elevate [their] approach" in accordance with an increased perception of danger; for instance, if suspects were known to have a criminal history, a SWAT team might be used.  [Tr. 45-47]   In this case, Boady testified, neither Defendant had a criminal history.  [Tr. 47]

The Government cites no authority that patdowns are acceptable as part of standard procedure when the search warrant is for a nonviolent offense.  Beyond the facts that this was a residence and officers discovered three unexpected occupants, the Government provided no evidence that agents had any particular reason to suspect threats to their safety in this particular case.

*Ybarra* held that it is unreasonable to pat down the occupants of premises searched under a warrant without showing that a frisk for weapons was supported by reasonable suspicion that the occupant was armed and dangerous, in accordance with the standard set by *Terry*. *Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1979); *Terry v. Ohio*, 392 U.S. 1 (1968). The Supreme Court has recognized that execution of search warrants presents a significant risk of harm to officers, and that minimizing this risk is an important factor in balancing the competing interests:

> Less obvious, but sometimes of greater importance [than risk of flight], is the interest in minimizing the risk of harm to the officers. <u>Although no special danger to the police is suggested by the evidence in this record</u>, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.

*Summers*, 452 U.S. at 702-03 (emphasis added); *see Mena*, 544 U.S. at 99-100 (upholding use of handcuffs for two to three hours to effectuate Mena's detention, when search warrant was for deadly weapons and evidence of gang membership). More recently, the Supreme Court held that officers took reasonable actions to ensure their safety while executing a search warrant, when officers ordered unclothed occupants out of bed and held them at gunpoint for one to two minutes while officers assessed the situation and secured the premises. *Los Angeles County v. Rettele*, 550 U.S. 609, 611, 614-16 (2007). Even though the occupants were not the subjects of the search warrant, the officers acted reasonably to protect themselves when the occupants were in a house where officers believed a suspect might be armed. *Id*. at 614-15. *Rettele* emphasized that these intrusive actions continued no longer than necessary to protect the officers against a risk of harm. *Id*. at 615.

The caselaw thus supports the use of force and patdowns when reasonably necessary to protect officers while they execute a search warrant.  These cases, however, involved searches for narcotics or deadly weapons, or searches in which a suspect was believed to be armed.

The Tenth Circuit holds that there is no categorical authority to pat down occupants of premises that are being searched under a warrant.  Instead, there must be an independent justification to support a patdown.  *See United States v. Ward*, 682 F.2d 876, 880 (10th Cir. 1982) (holding patdown of defendant unconstitutional during execution of search warrant at defendant's residence); *United States v. Sporleder*, 635 F.2d 809, 814 (10th Cir. 1980 (holding search warrant of meth lab did not justify patdown of defendant on premises, without additional showing of reasonable belief defendant was armed and dangerous).  The Tenth Circuit more recently reaffirmed the holding of these cases.  *Denver Justice & Peace Comm. v. Golden*, 405 F.3d 923, 931 (10th Cir. 2005).

 In *Denver Justice & Peace Committee*, the Tenth Circuit held that Supreme Court cases "do not support an officer's categorical authority to conduct a pat-down search of any person who seeks to enter an area where a search warrant is being executed."  *Id.* at 931 (discussing *Mena* and *Summers*).  Although the issue in *Denver Justice & Peace Committee* concerned a patdown of a person seeking to enter the premises, the Tenth Circuit's analysis does not allow a distinction between a person seeking to enter and a person already present on the premises, because the Court reaffirmed its earlier holdings in *Ward* and *Sporleder*.  *Id*. at 929.  The Tenth Circuit expressly and emphatically rejected the argument that, "for reasons of officer safety and general efficiency in executing a lawful search warrant," police should have authority to conduct a patdown even without a showing of reasonable suspicion that a person is armed and dangerous.  *Id*. at 928.  The Court stated:  "This Circuit has never articulated such a principle and will not do

so now." *Id*.  Holding that the nature of the search warrant is an important consideration, the Court contrasted search warrants for weapons or for proceeds of armed robbery with search warrants for nonviolent crime.  *Id*. at 930-31.  In *Denver Justice & Peace Committee*, the search warrant was for pamphlets, flyers, and membership lists in relation to an investigation of alleged vandalism—not for weapons, proceeds of a violent crime, or contraband.  *Id*. at 930-31.

The Tenth Circuit held that caselaw acknowledging the risk of danger inherent in execution of any search warrant does not justify routine frisks.  *Id*. at 929.  Instead, there must be a showing of reasonable, individualized suspicion to justify a patdown—just as for a *Terry* stop. *Id*. at 932.  The Court further held that the right was clearly established.  *Id*. at 932.

As in *Denver Justice & Peace Committee*, the offenses alleged against the Channons are nonviolent.  According to the Tenth Circuit, there is no "categorical authority" to conduct patdowns when executing a search warrant; the patdowns of all occupants cannot pass muster if presented merely as part of standard operating procedure in executing any search warrant, even for a nonviolent offense.  Defendants did not have criminal histories.  The Government presented no evidence to support a reasonable suspicion that there would be weapons in the house or a violent response from the occupants.

Boady's testimony does show, however, that officer experience suggests a greater risk of danger when executing a search warrant at a residence as opposed to a business location.  More important, the officers did not expect the three additional people to be in the house and did not know who they were or what connection they had to Defendants or the residence; these circumstances provide some support for patdowns while officers assessed the situation and determined whether there was an additional risk of danger from these people.  *Cf. Reeves*, 484 F.3d at 1260-61 (holding brief pointing of weapons reasonable while officers determined threat

level of unknown persons); *Thompson*, 58 F.3d at 1517 (holding objectively reasonable officers' temporarily handcuffing unknown occupant while officers determined her relationship to suspect and her "possible reaction" to the situation).  The precautionary steps in conducting brief and minimally intrusive patdowns must be balanced against the grave interest of the agents in the potentially dangerous business of executing a search warrant.  *See United States v. Mosley*, 743 F.3d 1317, 1329 (10th Cir. 2014) (recognizing that careful balancing of nature and quality of intrusion on individual must be balanced against interest in safety of officers); *Harman v. Pollock*, 446 F.3d 1069, 1083 (10th Cir. 2006) (acknowledging that execution of search warrants is dangerous).  Whether it was reasonable for agents to conduct patdowns "'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Mosley*, 743 F.3d at 1329 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

### (6) Restriction of movement

At the beginning of their approach to Brandi, to ask whether they could interview her, agents told Brandi she was free to leave and that she was not in custody or under arrest.  [Tr. 29-33, 56]  Brandi testified that she was so advised.  [Tr. 56, 68]  Brandi also testified that neither agent ever threatened her, touched her, or yelled at her during the interview.  [Tr. 70]

Brandi claims that her freedom to move around inside her home was curtailed.  Brandi also states:  "Agents informed [her] she was free to leave her own residence, but agents did not tell her that they would leave if she wanted."  [Doc. 53, p. 4]  The Government states that this is correct; since they had a valid search warrant to execute, agents would not leave if Brandi wanted them to, nor would they allow her free access to her house during the search.  And even if Brandi decided to remain because of concern about her cat, this concern exerted no coercion on her to make a statement.

The Court finds that Brandi's claims on this point do not support her claim of a coercive environment.  These are merely factors incidental to execution of a search warrant.

### (7)  Conclusion on coercive activity by agents

The Court cannot conclude that there was no coercive activity by the agents.  Three factors provide some support for Defendant's claim of a coercive environment:  the brief pointing of weapons, patdowns, and brief use of handcuffs—though not on Brandi.  On the other hand, after these events, Brandi was told she was not in custody, was not under arrest, and was free to leave.  She was questioned in her own backyard.

The Court concludes, however, that it need not decide whether the use of weapons, handcuffs, and patdowns was unreasonable and constituted coercive activity, because any coercive effect had dissipated by the time Brandi gave her statement.  After the brief pointing of weapons, agents had put away their weapons and taken off their body armor; some of the armed agents had left.  Boady had holstered his weapon so that it was no longer visible.  The level of force—both in number of agents and display of weapons—had been reduced as quickly as agents believed they could conclude there was no risk of danger.  Brandi was never handcuffed, and the use of handcuffs on the two male occupants was brief, lasting only about the ten minutes it took to clear the house.  The Court finds that the patdowns were brief and minimally intrusive; Brandi herself did not characterize this as a significant event, testifying that it was only a "brief little patdown."  [Tr. 53]

After the pointing of weapons and patdown, Brandi stood in her front yard for about ten minutes while the house was cleared.  Agents then told Brandi she was free to leave, was not in custody, and was not under arrest.  Agents requested permission to interview Brandi, and she gave permission.  They then walked to the backyard, seated themselves at a comfortable

distance, with Brandi's friend Roberta Duran-Gonzales also in the backyard, and began to talk, in normal conversational tones.  At least ten minutes had passed before the interview actually began.  The Court finds that all of these intervening circumstances dissipated any coercive effect. *See Lopez*, 437 F.3d at 1066 (holding that the issue is whether any coercion was sufficiently dissipated by intervening circumstances).  Most important, Brandi had been advised that she was free to leave and that she was not required to talk to the agents.  Although the latter advice was not given in these words, the agents' request for permission to speak to Brandi would convey to a reasonable person that she was free to decline to speak with the agents.  *See United States v. Drayton*, 536 U.S. 194, 206 (2002) (stating that officer's request for permission to search conveys to reasonable person that she is free to refuse); *United States v. Thompson*, 546 F.3d 1223, 1228 (10th Cir. 2008) (observing that explicit advice person can refuse to talk with officer is not required).

The Court concludes that it need not decide whether the weapons, handcuffs, and patdown were sufficiently coercive to have "caused" Brandi's confession, absent intervening circumstances.  *See Cash*, 733 F.3d at 1281-82 (holding that "a necessary predicate for an involuntary confession claim" is that police coerced defendant into making statements).  Because there were significant intervening circumstances, the Court finds that any coercion from the manner in which agents conducted the beginning of the search warrant execution had dissipated by the time agents approached Brandi and asked whether she would agree to an interview, and had dissipated further by the time Brandi and the two agents made their way to the backyard and seated themselves.  *See Lopez*, 437 F.3d at 1066 (holding that the coercion surrounding the first interview had been sufficiently dissipated so that the second statement was voluntary).  This

finding depends on the Court's inferences regarding the continuing effect of any coercive conduct, under the totality of the circumstances.  *See Lopez*, 437 F.3d at 1066.

Viewing the record as a whole, the Court determines that Brandi's statements were not "caused" by any coercion.  *See Cash*, 733 F.3d at 1282 (concluding that record as a whole did not "support that police coercion caused Mr. Cash's confession").  The Court concludes that Brandi's statements were voluntary.

**(B) Defendant's Personal Characteristics**

Since the Court concludes that coercive activity by the agents did not cause Brandi's confession, the Court need not reach the next issue—consideration of Defendant's personal characteristics to determine whether she was unusually susceptible to coercion.  *See Lopez*, 437 F.3d at 1063-64; *Cash*, 733 F.3d at 1281.  Because the Court believes that the Government has not fully justified the level of force used, however, the Court will proceed to consider Defendant's personal characteristics:  (1) the defendant's age, intelligence, and education; (2) the length of detention; (3) the length and nature of questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment.  *Cash*, 733 F.3d at 1280-81; *Lopez*, 437 F.3d at 1063-64.

Brandi was thirty-one years old at the time, with a high school diploma and several years of community college.  [Tr. 65]  She was a line manager at Home Depot for several years, worked at Citibank, was a bailiff for five months, and for about two years was a secretary or a runner at the District Attorney's Office.  [Tr. 66]  Considering Brandi's age, intelligence, and education, the Court finds that she was not "unusually susceptible to coercion."  *Lopez*, 437 F.3d at 1063 (concluding that record did not suggest defendant "unusually susceptible to coercion" because of age, education, or intelligence when he was thirty-three years old and completed

eleventh grade).  In making this finding, the Court also relies on its observation of Brandi while she testified at the June 11th evidentiary hearing.

The second factor is the length of detention.  The Court finds that Brandi was not detained at the time she gave her statement, and that there was no reason for her to feel detained or restrained at that time.  As she herself testified, she was told that she was free to go, was not in custody, and was not under arrest.  The Court also finds that Brandi could have stopped talking to Boady and Berry at any time.

The third factor, the length and nature of questioning, again shows no coercion or unusual susceptibility to coercion.  The Court finds that the interview, only thirty to forty-five minutes long, was reasonable and not prolonged.  The questioning was not aggressive or intimidating, but was carried on in a normal, respectful, and polite tone.

The fourth factor is whether Defendant was advised of her constitutional rights.  Brandi was not given *Miranda* warnings; however, *Miranda* warnings were not required since (as the Court determines below) Brandi was not in custody.  And Brandi was advised that she was free to go, was not in custody, and was not under arrest.  Although Boady did not remember explicitly telling Brandi that she did not have to speak to them, Boady did "remember specifically asking her if [they] could interview her."  [Tr. 32]  The fact that Boady asked Brandi for permission to talk with her necessarily conveyed the advice that she had the right to decline. *See Drayton*, 536 U.S. at 206.

The fifth factor is any physical punishment.  Brandi was subjected to a brief patdown for weapons.  As she walked out the front door, she was pulled to move more quickly away from the door.  [Tr. 22, 33-34, 53]  No physical punishment whatsoever was exercised on her.

The Court finds that Brandi was not particularly susceptible to police coercion.  *See Cash*, 733 F.3d at 1279 (stating that susceptibility to coercion is a factual question).  Under the totality of the circumstances, and taking into account Defendant's personal characteristics, the Court finds that Defendant's statement was voluntary.  *See Lopez*, 437 F.3d at 1063-64; *Cash*, 733 F.3d at 1279.

## II.  Custodial Interrogation Without *Miranda* Warnings

The parties' pleadings focus on whether Brandi was "in custody"; the Government does not argue that she was not interrogated.  Brandi apparently relies on the same circumstances to show that she was in custody as to show that her statement was not voluntary:  she was woken from early-morning slumber, weapons were drawn, multiple government agents were present, more than one person (but, importantly, not Brandi) was handcuffed, she was subjected to a brief patdown, and her movement within her home was restricted.  The Government responds that Brandi was not in custody and *Miranda* warnings were therefore not required.

Before *Miranda* warnings are required, a suspect must be "in custody" and the questioning must constitute "interrogation."  *Bennett*, 329 F.3d at 774.  A suspect is not "in custody" unless his "'freedom of action is curtailed to a degree associated with formal arrest.'" *Id*. (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).  "Interrogation" refers to "'either express questioning or its functional equivalent.'"  *Cash*, 733 F.3d at 1277 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)).

Whether a person is "in custody" is an objective inquiry.  The Court must determine whether "'a reasonable [person] in the suspect's position would have understood [the] situation … as the functional equivalent of formal arrest.'"  *United States v. Chee*, 514 F.3d 1106, 1112

(10th Cir. 2008) (quoting *Berkemer*, 468 U.S. at 442).   The issue requires "a fact-intensive inquiry focusing on the totality of the circumstances." *Id*.

The Tenth Circuit stated that it is important whether the suspect was made aware that she was free to refrain from answering questions or to end the interview.  *Chee*, 514 F.3d at 1112; *United States v. Revels*, 510 F.3d 1269, 1276 (10th Cir. 2007).  Agents asked whether Brandi would be willing to let them interview her.  [Tr. 30-32]  Boady did "remember specifically asking her if [they] could interview her," although Boady did not remember explicitly telling Brandi that she did not have to speak to them.  [Tr. 32]  Although the latter advice was not given in these words, the request for permission to speak to Brandi would convey to a reasonable person that she was free to decline to speak with the agents.   *See Drayton*, 536 U.S. at 206 (stating that officer's request for permission to search conveys to reasonable person that she is free to refuse); *Thompson*, 546 F.3d at 1228 (observing that explicit advice person can refuse to talk with officer is not required).  As Brandi herself testified, agents told Brandi that she was free to leave and that she was not in custody.  [Tr. 11, 30-33]  The Court finds that Brandi was made aware that she was free to decline to speak to the agents and that she could stop talking to them, or leave, at any time.

Also important are the nature of the questioning—whether prolonged and accusatory. *Chee*, 514 F.3d at 1112.  Boady testified that they spoke in a normal and quiet conversational tone, and were not aggressive.  [Tr. 16, 36]  They spoke quietly, in part so that they would not be overheard in the interview of Duran-Gonzales, which was also going on in the backyard.  [Tr. 36]  Boady testified that his manner and tone were the same as in his testimony at the evidentiary hearing.  [Tr. 36]  The Court finds that the agents' tone was calm and conversational, and not aggressive, accusatory, or intimidating.  *See United States v. Rogers*, 391 F.3d 1165, 1170-71

(10th Cir. 2004) (holding that cordial, non-intimidating tone is factor indicating non-custodial encounter). In making this finding, the Court relies both on the substance of Boady's testimony and on the Court's observation of Boady's tone and manner of speaking during the evidentiary hearing. The Court finds that the questioning was not prolonged; the interview lasted only thirty to forty-five minutes.

Unpersuasive are Brandi's claims that her freedom to move around inside her home was curtailed and that agents did not tell her they would leave if she wanted them to. [Doc. 53, p. 4] Although Brandi was not free to move around inside her home unescorted and unobserved during the search, no reasonable person would conclude that this limitation on movement "rose to the level of a restraint on freedom of action associated with formal arrest." *Rogers*, 391 F.3d at 1171 n.2 (holding that defendant was not in custody, despite not being allowed to "roam around [his] house at will" while girlfriend removed her possessions under protective order supervised by officers). The Government correctly observes that agents were not required to leave, since they had a valid search warrant to execute.

Also unpersuasive is Brandi's claim that they were "woken from early-morning slumber." The search warrant was executed at 7:12 a.m., a reasonable time even if these particular occupants were still asleep.

In addition, it is important to determine "whether the environment was 'police dominated.'" *Chee*, 514 F.3d at 1113. "Indications of whether the police are in full control may include whether the suspect was separated from his family and isolated in a nonpublic questioning room, whether there was the threatening presence of several officers, whether there was any display of weapons or physical contact with the suspect, and whether the officer's language and tone indicated that compliance might be compelled." *Id*. As discussed above,

agents briefly pointed weapons at the front door and the occupants as they walked out, used handcuffs briefly on the two men—but, importantly, not on Brandi—and all occupants were subjected to patdowns.  On the other hand, critical circumstances indicated that Brandi was not in custody:  Brandi was questioned by just two agents, in her own backyard, and her friend Roberta Duran-Gonzales was simultaneously questioned in the backyard.  *See Revels*, 510 F.3d at 1275 (determining there was police-dominated atmosphere and defendant was in custody when she was isolated from other occupants and held inside a bedroom, with door closed— though within her own home—and questioned by up to three officers); *Rogers*, 391 F.3d at 1170-71 (observing that interrogation in defendant's home weighs in favor of finding defendant not in custody); *United States v. Betche*, 540 Fed. Appx. 838, 841-42 (10th Cir. 2013) (unpublished) (stating that fact interrogation was conducted right outside defendant's home indicates non-custodial encounter).

As discussed above, the Court finds that any questionable display of force (weapons, handcuffs, patdowns) ended before Brandi agreed to speak to the agents, and any coercive effect had dissipated.  It is critical that a defendant is not subject to any restraint at the time of questioning.  *Compare United States v. Perdue*, 8 F.3d 1455, 1464-65 (10th Cir. 1993) (holding defendant was "in custody" when police used firearms to restrain defendant during questioning, and did not tell him he was free to leave), *with Peck*, 1999 WL 33022, *3 (concluding suspect not in custody when police initially used firearms and handcuffs to restrain him but freed him of any restraint during questioning and told him he was not under arrest).  By the time Brandi agreed to speak to the agents, and they walked to her backyard for the interview, no force or restraint was in effect.  Brandi had been told she was free to go, was not in custody, and was not under arrest.

Based on all of the facts and circumstances, the Court finds that Brandi was not in custody when she made her statement.  There was no restraint on her approaching the "degree associated with formal arrest."  *Berkemer*, 468 U.S. at 440.  Brandi was in her own backyard, after agents asked her permission to speak with her, and her friend Duran-Gonzales was also in the backyard at the time.  There were only two agents speaking to Brandi—no threatening presence of several officers, there was no display of weapons near the time of the interview, and there was no force or language indicating that compliance might be compelled.  *See Chee*, 514 F.3d at 1113.  Brandi's subjective impressions about her degree of freedom are not relevant.  *See Rogers*, 391 F.3d at 1170-71.

The Court concludes that no reasonable person in Brandi's situation would have felt that her freedom of action was restrained to a degree associated with formal arrest.  *See id*.  Because Brandi was not in custody, *Miranda* warnings were not required.

## CONCLUSION

The Court concludes that Defendant's statement was voluntary.  The Court also concludes that Defendant was not in custody, so *Miranda* warnings were not required.


**IT IS THEREFORE ORDERED** that Defendant Brandi Channon's *Motion To Suppress Statements by Defendant*  [Doc. 52] is **DENIED.**


_____
**UNITED STATES DISTRICT JUDGE**

27